Matter of J.R. (N.R.) (2025 NY Slip Op 50698(U))

[*1]

Matter of J.R. (N.R.)

2025 NY Slip Op 50698(U)

Decided on January 13, 2025

Family Court, New York County

McFarland, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 13, 2025
Family Court, New York County

In the Matter of J.R. 
 J.M. BOY
J.M. GIRL Children Under the Age of Eighteen Alleged to be Abused/Neglected by N.R. L.M., Respondents.

Docket No. XXXXX

Petitioner Father: Administration for Children's Services
Morgan Molinoff, Esq.
Attorney for Respondent Mother: Neighborhood Defender Services
Emily Herder, Esq.
Attorney for the Respondent Father: Center for Family Representation
Alexandra Rosin, Esq.
Attorney for the Children: Legal Aid Society
Brad Martin, Esq.

Janet L. McFarland, J.

On October 15, 2024, the Administration for Children's Services (hereinafter "ACS") filed an abuse petition against the Respondent Mother, N.R., and the Respondent Father, L.M., on behalf of the subject children, hereinafter referred to as "The Children" or "J.R.," "J.M. Boy," "J.M. Girl." The petition alleged that on or about October 14, 2024, the Children's sibling, J., was pronounced deceased based upon allegations of malnourishment and starvation by the Respondents. The remaining subject children were also observed to be severely malnourished. As a result, ACS filed the pending Article 10 petition and sought a remand of the subject children.
The Respondents were arrested based upon the allegations. Media coverage of the case, [*2]both in the criminal court and family court, ensued including TV coverage and newspaper articles. The media has covered photos of the deceased child, photos of the Respondents, and details of the condition of the home, condition of the deceased, and details of the current case. Members of the press have also appeared in court to observe the proceedings and subsequent news articles have been posted detailing the legal procedures.
Based upon the media coverage, the Attorney for the Children filed an Order to Show Cause [No.3] on December 9, 2024 seeking to exclude the press from all future proceedings, sealing the court transcripts, and any evidentiary evidence submitted to the record in this matter. On December 11, 2024, a hearing was conducted on the Order to Show Cause.
On consent, the Court received the following items into evidence:
AFC Exhibit 1: New York Daily News Article Dated 11/12/24, ABC News Article dated 10/16/24, CBS News Article Dated 10/25/24, CNN News Article dated 10/19/24, ABC News Article Dated 10/21/24, CBS News Article Dated 10/19/24, NBC News Article Dated 10/24/24, NBC News Article Dated 10/26/24, NBC News Article Dated 10/20/24, Spectrum News Article Dated 10/15/24, Gothamist Article Dated 10/16/24
AFC Exhibit 2: "Protecting Victims' Identities in Press Coverage of Child Victimization, Journal Article by Lisa M. Jones, David Finkelhor, and Jessica Beckwith
AFC Exhibit 3: Affidavit of S.C., LMSW, Forensic Social Worker Juvenile Rights Practice, Legal Aid Society.
The Court also heard testimony from S.C., LMSW, Forensic Social Worker from the Legal Aid Society's Juvenile Rights Practice. Both the Respondent Mother and the Respondent Father were in support of the Attorney for the Child's application. ACS took no position.
Attorney for the Child's Exhibit 1
Based upon a review of the documents in Exhibit 1, the following has been disclosed by the media:
-Names of the deceased child, the parents, the paternal grandmother, two aunts, the attorneys assigned, the jurist assigned, the foster care agency assigned.
-The subject children's prior address
-The ages of the surviving siblings
-The children's prior stay at Bellevue Hospital
-The area of the children's foster home
-Date of the deceased child's death
-Basis and details of the child's death
-Description of the home
-Criminal charges against the parents
-Neighbor's statements
-Children's condition at the hospital
-Photos of family members
Testimony of S.C.
The Court heard testimony from S.C., forensic social worker from the Legal Aid Society's Juvenile Rights Practice. Ms. C. testified that she has been an LMSW in New York since 2014 and received her master's degree in social work at Columbia University. She has been employed with the Legal Aid Society for ten years where she interviews children, makes [*3]recommendations, identifies the children's needs, and makes necessary recommendations. Ms. C. was qualified as an expert in social work.
Ms. C. met with the subject children twice; once at Bellevue Hospital in October 2024 and once in the foster home in November 2024. During her first interviews with the children, they could not communicate or answer any questions. She testified that the children appeared to be very weak and appeared smaller than other children in their age range. Per Ms. C.'s conversation with the hospital social worker at Bellevue, the children presented to the hospital with significant communication and speech delays.
On November 18, 2024, Ms. C. met the children at the foster home after they had been residing there for about a week. The children were still unable to answer any questions. It appeared that J.R. and J.M. Boy were somewhat verbal whereas J.M. Girl appeared to be a bit shier than her siblings. Ms. C. noted that the children's appearances improved from her initial assessment. The children's foster parent indicated that the children were having a hard time sleeping through the night and would spend time having to calm the children.
After her assessments with the children, Ms. C. testified that it is her recommendation that the media and press be excluded from all future proceedings on the basis that the information that will be shared in the proceedings would be a violation of the HIPAA laws, the children will be exposed to the public which would damaging to their well-being. Specifically, as life goes on for the children, they will have access to the internet and see their information which would potentially be a source of bullying.
 LEGAL ANALYSIS
Public access to court proceedings is a fundamental tenet in law. Public access has long had its roots based upon the need to protect citizens from unjust persecution by governmental authorities and to safeguard from any possible abuse of judicial power. See People v. Jelke 308 NY 56 [Ct of App 1954.] There are, however, limitations to such public access contemplated by NY JUD §4 stating that "sitting of every court within this state shall be public, and every citizen may freely attend the same, except that in all proceedings and trials in cases for divorce, seduction, rape, assault with intent to commit rape, bastardy, filiation, or a crime formerly defined in sections 130.50, 130.45, and 130.40 of the penal law, the court may in its discretion, exclude therefrom all persons who are not directly interested therein, excepting jurors, witnesses, and officers of the court."
The fundamental rule of public access applies equally to matters heard in Family Court. See Kent v. Kent 29 AD3d 123 [App Div 2006.] Pursuant to 22 NYCRR 205.4, the Family Court is open to the public including news media. Such access would include courtrooms, lobbies, public waiting areas, and other common areas of the Family Court. Upon a finding that compelling interests justify closure or partial closure, the right of public access to court proceedings may be limited, especially where the interests of children are implicated. See Herald Co., Inc. v. Weisenberg 89 AD2d 224 [App Div 1982], see also Anonymous v. Anonymous 263 AD2d 341 [App Div 2000.] Thus, Section 1043 of the Family Court Act contemplates the need for exclusion from the courtroom, stating, that the general public may be excluded from any hearing under this article. When considering an application to exclude the public or a person the courtroom, the Court must apply the strict standard laid out in 22 NYCRR 205.4(b) regarding what the Court should consider.
Specifically, 22 NYCRR 205.4(b) states the following:
(b) The general public or any person may be excluded from a courtroom only if the judge presiding in the courtroom determines, on a case-by-case basis based upon supporting evidence, that such exclusion is warranted in that case. In exercising this inherent and statutory discretion, the judge may consider, among other factors, whether:
(1) the person is causing or is likely to cause a disruption in the proceedings;
(2) the presence of the person is objected to by one of the parties, including the attorney for the child, for a compelling reason;
(3) the orderly and sound administration of justice, including the nature of the proceeding, the privacy interests of individuals before the court, and the need for protection of the litigants, in particular, children, from harm, requires that some or all observers be excluded from the courtroom;
(4) less restrictive alternatives to exclusion are unavailable or inappropriate to the circumstances of the particular case.
Whenever the judge exercises discretion to exclude any person or the general public from a proceeding or part of a proceeding in Family Court, the judge shall make findings prior to ordering exclusion.
Such determination requires the Court to strike "'the proper' balance [between] the right of access of the public and the press to judicial proceedings [and] the interest in protecting children from the possible harmful effects of disclosing [harmful information] to the public" See id at 343. See also Matter of P.B. v. C.C., 647 NYS2d 732, [App Div 1996] quoting Matter of Katherine B. [App Div 1993], 189 AD2d 443 at 450 "Judicial discretion must be exercised against a strong presumption of openness." Matter of M. S., 173 Misc 2d 656, 659, 662 N.Y.S.2d 207. A court may find against the presumption only when evidence of that harm, or potential harm, is compelling.
In Katherine B., the Appellate Division overturned an order from family court denying an application for exclusion of the press. The Appellate Division, in balancing the press' right of access against the State's interest in protecting children from the possible harmful effects of disclosing the public allegations and evidence of parental abuse and neglect, based their decision utilizing the factors set forth in 22 NYCRR 205.4. Katherine B. involved a child kidnapped by an adult family friend, imprisoned in an underground dungeon in his home for 16 days where he sexually abused her. An Article 10 petition was filed against the child's mother and subsequently became the topic of media coverage. At the time of the proceedings, the child's identity had been disclosed to the public and several sensitive details about the case had already been widely disseminated. An affidavit from the child was submitted to the Court detailing the child's embarrassment and shame about the events, such emotions, exacerbated by her knowledge that the details of her life and the incident were not private. Based upon the harm posed by the media's presence in the courtroom to the child's mental and emotional health as well as the information already disclosed to the media, the court excluded the press from all future proceedings.
Disruption
The Attorney for the Children contends that while the presence of the press in the courtroom would not cause a physical disruption, it would cause subtler distractions. The Attorney for the Child states that his duty to protect his clients from the press will hinder his ability to zealously advocate for the children as he will be unable to fully advocate without risking their confidentiality and safety to detail facts of the case.
The Attorney for the Children cites to Matter of Ruben R. 219 AD2d 117 (1st Dept 1996) where the court overturned an order denying an application to exclude the press based upon extraordinarily sensitive and personal nature of the information that was going to be addressed in open court, strong evidence that publication would be harmful to the children, and the impossibility of protecting the children's right to privacy due to the previous disclosure of the children's identities. In Ruben R. the court was tasked with striking a sensitive balance between the potential trauma to the mental and physical well-being of the children from public dissemination of certain personal aspects of their lives and the interests of the press in having free access to judicial proceedings. The facts in Ruben R involved a six-year-old who had been murdered and her mother was indicted for the murder. The child's half-siblings were the subject of an Article 10 petition and the case became the topic of intensive media coverage. At the time of the motion, the media had disclosed the identities of the surviving children, full names, and ages of the two oldest children, photos of the children, a statement by one of the children, a photo of the parents with the children on the cover of Time Magazine, and an account of the grand jury testimony of the children in the New York Post. Present during the hearing were reporters from WCBS, the New York Post, the New York Times, the Associated Press, the Daily News, and New York 1.
In the attorney for the children in Ruben R., much like the attorney for the children in this matter, argued about their inability to advocate for their client due to having to refrain from discussing the details of the children's past or present circumstances to avoid disclosure of sensitive information. The court noted that the cases cited in support of exclusion had shown that the identities of those children in those cases had already been disclosed in the media. Thus, the court deemed that exclusion of the press was necessary as protections such as not publishing the children's names in accounts of the abuse proceedings would be futile since their names, and pictures, had already been disseminated by the media.
At the time of filing of the instant Order To Show Cause, there had been numerous appearances before this Court. Of those appearances, members of the press have been present. Like Katherine B., there have been no disruptions by the mere presence of the press and the decorum presented by members of the press has been appropriate thus far. However, the cases cited are different in this matter in that the children's identities or names have not been disclosed. At this time, the only name disclosed has been the parents, family members, and the deceased child. This Court believes that by taking certain measures such as abbreviating the children's names can still be utilized in this matter to protect the children's privacy.
Compelling Reason and Orderly and Sound Administration of Justice
The Attorney for the Children argues that exclusion of the press is necessary for the compelling reason that the children's personal medical information and service plan will be an important part of the evidence. The Attorney for the Child points to any future proceeding requiring information about the children's fragility, their understanding of their sibling's death, and their ongoing medical and therapeutic treatment.
22 NYCRR 205.4(3) delineates the factors the court should consider as when determining whether the presence of press would create a disruption in the orderly and sound administration of justice, namely: the nature of the proceeding, privacy interests, and the need for protection of the litigants, in this instance, the children from harm.
The Attorney for the Children contends that the presence of the press would make it [*4]impossible to represent their clients without risking their confidentiality and safety such that they would not be able to freely discuss the case. He further argues that the media reports posted on the internet pose lifelong consequences to the subject children. As such, he argues, the orderly and sound administration of justice warrants an exclusion of the press based upon the potential harm posed by the discussion of pertinent medical and psychological information.
In Katherine B. and Ruben R., the Court deemed exclusion necessary based upon the lifelong consequences of internet exposure, the additional burden victims carry based upon media publicity, and the potential increase of shame and ridicule from peers. In Katherine B., the child had already been exposed to bullying from her peers and her affidavit submitted to court detailed the shame and embarrassment she felt by media presence in the courtroom. Similarly in Ruben R, the personal and identifying details of the children had already been disseminated resulting in ridicule from their peers and shame and guilt arising from the incident. In both cases, as stated previously in this decision, the children's identities had already been identified and the press' presence and actions caused emotional harm to the children. Counsel cites to In re S.B.B.R. Children 12 Misc 3d 1172(a) [2006] where press was excluded based upon concerns about discussing the surviving children's current needs. Again, like Katherine B. and Ruben R., the children's identities were already publicized.
In the Matter of Crocker C. v. Anne R. 52 Misc 3d 1205(a) [2016], the court in that matter denied the application for exclusion of the press where the damage to the children in that matter was speculative. Crocker notes that the child in Katherine B had already experienced bullying by the ongoing television coverage. In Crocker, much like the instant case at hand, the Attorney for the Children had raised arguments about the potential harm in "this internet age" and that the children may one day learn about the allegations, and it may cause them embarrassment. However, the "possibility of some unspecified future harm does not constitute a compelling interest to justify closure. See Anonymous at 263.
Thus, while the Court does share concerns about the potential harm by the media coverage, any harm in this matter, remains speculative. The children have not expressed any active bullying or ridicule, or shame caused by the media's presence in the courtroom. While there is the potential for harm based upon articles on the internet, there is no active harm to the children. Further, this Court finds that by creating strict conditions about disclosures of the children's identities and presence of the press in the courtroom, there are safety measures that can be implemented to mitigate that harm.
Less Restrictive Alternatives.
Lastly, 22 NYCRR 205(4) states that exclusion of the press is warranted when there are no lesser restrictive alternatives to safeguard the protection of the children against the public's access to courtroom proceedings.
In all cases cited by counsel in support of exclusion, the children's identities from their names, ages, dates of birth, and photographs had already been widely disseminated within the media. In this instant matter, the children maintain some semblance of privacy as their names, photographs, or dates of birth have not been disclosed. The information disseminated has not shown much identifying information regarding the subject children except their current location and their ages.
Thus, this Court believes there are less restrictive alternatives and appropriate safeguards that can be implemented to maintain the privacy of the subject children. This Court has the [*5]discretion to set forth reasonable conditions on those who are permitted to attend its proceedings to maintain courtroom decorum and to protect the privacy of the parties before the court. As such, the following conditions will be reduced to a short form order and provided at each appearance to every observer including members of the press who attend.

 Conditions for Press
1. Any member of the press must identify themselves and provide appropriate press credentials prior to entering the courtroom.
2. To maintain and safeguard the privacy of the parties involved, no member of the press may disclose the identity of the children involved nor publish any information from which their identities could be ascertained including but not limited to: the children's names, dates of birth, the children's school, and service providers. Sanctions may be imposed for violation of this clause upon application. Failure to agree with the conditions may result in exclusion from the courtroom.

Additional Conditions
3. The children's full names will be abbreviated in all court documents as follows: J.R., J.M. Boy, and J.M. Girl.
4. All reports submitted to the court must redact the following: any information containing the children's names and dates of birth, the names of the children's school, doctors, service providers, names of the foster parents, addresses, phone numbers.
5. All evidence submitted to the Court will be deemed confidential and sealed to protect the identities of the subject children.
6. All transcripts shall abbreviate the children's names. Any release of the transcripts shall be upon application to the Court. If granted, an in-camera review will be conducted to redact any confidential or identifying information of the subject children.
7. Court documents released to attorneys and non-parties on the Article 10 matter is to be upon application to the Court. If granted, any identifying information of the subject children shall be redacted.
8. Any disclosure of the children's names, providers, and location during testimony shall be protected by clauses #2, #3, #5, #6, #7.
9. Any party may file a motion to re-argue if new information is obtained that would warrant exclusion of the press.
Based upon the foregoing, the Attorney for the Child's Motion to Exclude the Press [#3] is DENIED IN PART and GRANTED IN PART as it relates to the sealing of evidence. 
ENTER:
________________________________
HON. JANET L. MCFARLAND, J.F.C.